After the dust settled, literally, the Sun City lady asked Adrian to return the bill of lading to her. Adrian testified that the Sun City lady tried to alter the bill of lading she had signed immediately upon his arrival and presentment to her. He was uncertain of the means she used to try to alter this bill. Id. at 72-74.[3]
After the Sun City lady made those changes to the front of the bill of lading, Adrian made a written statement on the reverse, in Spanish. The Sun City lady then wrote her own statement below his, also in Spanish. [Ex. 8 to Jose Bernal, Sr.'s deposition, sixth page (Bal0028) ][4]
There exists a third version of the bill of lading. Jose Bernal, Sr. ("Jose") is the owner of Balance. He testified that it is his company's policy to require its drivers to send a picture of the bill of lading to Balance's office once the consignee of the shipment has signed it, verifying the shipment has been received by them.[5] According to Jose, a copy of the bill of lading is then sent to Balance's factoring company, *695 Sierra Finance, which places the stamp on the bill of lading stating: "Balance Transportation." The various versions of the bill of lading all contain the signature of the Sun City lady.
The signature of the Sun City lady on the bill of lading is critical to the resolution of the second factor of Red Chamber. There is no credible evidence before the Court to controvert Adrian's testimony that the Sun City lady signed the bill of lading immediately upon his arrival at its location and his presentment to her. This signature, acknowledging acceptance of the cargo, was executed prior to the unstrapping of the cargo by Adrian and the unloading of it by Sun City.
The receipt of delivery by the consignee, Sun City, is contemplated by the Agreement Paragraph 8 of the Agreement provides, in part:
Unless otherwise agreed in writing, CARRIER shall become fully responsible/liable for the height when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a bill of lading has been issued, and/or signed, and/or delivered to CARRIER, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt. (Emphasis added.)
In TQL v. Dadir, LLC , Case No. 2016-CVH-0705, (Jan. 10, 2018),[6] this Court found a similarly worded version of paragraph 8 of the Agreement here, imposed responsibility for a damaged shipment on the carrier up to the time the consignee signs the bill of lading , regardless of the fact that damages to the cargo may have been caused by the consignee. (Emphasis added.)
Dadir involved damage to a load of spinach and arugula caused by its exposure to temperatures outside the range as specified in the bill of lading. When the consignee signed the bill of lading it noted that its receipt was under protest due to warm temperatures. There was evidence that the consignee itself had exposed the load to higher temperatures for approximately four hours before taking temperature readings and signing the bill of lading rejecting the shipment This Court held that paragraph 8 clearly placed the risk of loss upon the carrier until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt . (Emphasis added.) This last clause requiring the consignee to sign the bill of lading or delivery receipt is a condition precedent to relieving the carrier of its liability under paragraph 8.
The same result occurs here, with paragraph 8 inuring to the benefit of the carrier, Balance. When Sun City signed the bill of lading, delivery was completed and Balance's responsibility/liability under the Agreement ended. This acceptance of delivery by Sun City is satisfactory proof that there was no failure of delivery and the cargo did not arrive in a damaged condition. Even if TQL was able to prove that some action of Balance was responsible for the damage to the cargo, the risk of loss for any cargo damage had shifted from Balance to the consignee by the unambiguous terms of the Agreement. Therefore, TQL cannot satisfy the second factor required by Red Chamber, supra.
Nevertheless, TQL argues that even though Sun City had signed the bill of lading, its signing did not mark the end of Balance's responsibility for the cargo loss. TQL asserts that delivery was not completed until after the bill of lading was first signed by the Sun City lady. It argues that *696 when the bill of lading was first signed by the Sun City lady, Adrian still had to move the truck, re-park it, and unstrap the granite. Assuming those tasks had to be completed before delivery was complete, the uncontroverted evidence is those tasks were, in fact, completed before damage occurred to the cargo after Sun City started to unload it More importantly, the unambiguous language of paragraph 8 of the Agreement does not require such an event or series of events, to occur before the risk of loss is shifted to the consignee.
TQL relies upon Merchants Terminal Corp. v. L & O Transport, Inc. , U.S. Dist. Ct. D. Maryland, No. SAG-09-cv-2065, 2012 WL 1416631 (Apr. 20, 2012), to support it claim that Balance had not completed its delivery before the damage occurred. In Merchants , the carrier was transporting a truckload of salmon from a customer's Delaware warehouse to its facility in Baltimore. The shipment arrived after the Baltimore location had closed. The customer permitted the carrier to make after-hours drops. It provided the carrier with a key to a chain lock that secured the gate of a 7'-8' high chain link fence enclosure. The carrier was to position its trailer against a loading dock so there was no way the trailer doors could be opened. The carrier was also to secure its trailer with a kingpin lock, a devise that prevents another rig from hooking up to the trailer and pulling it away. The kingpin lock was secured and unsecured with a key that remained with the carrier. Id. at *4-5. The carrier followed the directions but, nonetheless, someone cut the lock to the gate and stole the trailer. Id. at *6.
The carrier argued its delivery had been completed before the theft so it was not liable under Carmack. Id. at *7. The district court disagreed. It found the carrier, L & O, had not surrendered the goods to the customer's possession, custody and control because the trailer was secured by a kingpin lock for which only the carrier had the key. Id. at *10. In addition, the customer accepted delivery of shipments only after breaking the seal on the shipment, inspecting the goods and comparing the driver's paperwork with its own. Id. at* 11. Just dropping the container at the customer's loading dock was not enough to constitute delivery because possession, custody and control of the goods were not transferred to the customer. Id.
The facts here are quite different from those in Merchants . Here, Sun City signed the bill of lading accepting delivery of the cargo. Immediately upon signing, Sun City evidenced control of the cargo by directing Adrian where to move his truck, even if it was not a significant distance. There is no evidence to contradict Adrian's testimony that it is customary for the shipper's driver to unstrap a delivered load. Adrian T. at 58. This act does not evidence Balance still was in control of the load. Someone had to unstrap the cargo to allow it to be unloaded. Adrian simply followed his customary practice, because Sun City was unquestionably taking control of the cargo to unload it. Sun City further evidences control of its cargo by having its employee begin to unload it without any direction or supervision of Adrian.
Accordingly, as to Count 1, Balance's MSJ is granted and TQL's is denied.
In its second count, TQL argues that it is proper for parties to expressly adopt the Carmack Amendment into a broker/carrier agreement It contends that the parties have done so by operation of paragraph 8 of the Agreement at its fourth sub-paragraph. Therefore, "TQL can establish Defendant's liability for breaching the Agreement by establishing a prima facie case under the Carmack Amendment." (TQL* MSJ, p 12.) The Court disagrees.
*697 This Court has already found, under Count 1, that TQL cannot establish a prima facie case under Carmack because of its inability to prove delivery failure or arrival in a damaged condition. Without a prima facie Carmack case, TQL's breach of contract claim fails. Accordingly, as to Count 2, TQL's MSJ is denied and Balance's MSJ is granted.
TQL's third count contends, that among the claims assigned to it by C & C by operation of the Release and Assignment if has a claim for bailment against Balance. As TQL properly states, to establish a prima facie case for breach of a bailment duty, one of the elements it must prove is that the bailed property was redelivered in a damaged condition at the termination of the bailment Again, the Court has determined that TQL establish that the cargo was damaged upon delivery. Accordingly, as to Count 3, TQL's MSJ is denied and Balance's MSJ is granted.
Balance's MSJ
In its counterclaim, Balance seeks judgment against TQL for $ 1,900. This is the amount of Balance's open invoice that TQL applied to the amount it alleged Balance owed it due to the cargo loss. Balance claims the amount was misappropriated by TQL. There exists no genuine issue of material fact regarding TQL's conduct. In its complaint, TQL concedes that in arriving at the net amount Balance owed it for the damaged cargo, it deducted Balance's open invoice of $ 1,900 it owed to Balance.
The Agreement, at paragraph 8, subparagraph 4, reads: "BROKER reserves the right to offset any claim(s) with pending invoices." Therefore, TQL's actions were not wrongful as Balance alleges. In computing the amount of its alleged claim against Balance, TQL acknowledged that the amount of Balance's liability was subject to a $ 1,900 credit. Now that TQL's claim has been dismissed, any issue concerning the credit has become moot. Balance's $ 1,900 open invoice remains open and due. Accordingly, TQLs MSJ as to Balance's counterclaim is granted and Balance's MSJ is denied.
On September 7, 2018, the Court issued a scheduling order establishing a trial date and other deadlines to file a variety of motions. The Parties have also filed a number of motions in limine in accord with this order. As the Court has determined the summary judgment motions, these motions are rendered moot.
Based upon the above analysis;
IT IS HEREBY ORDERED that Balance is granted summary judgment against TQL as to all three claims asserted by TQL and TQL's motion summary judgment as to its three claims against Balance is denied.
IT IS FURTHER ORDERED that TQL's motion for summary judgment as to Balance's counterclaim is granted and Balance's motion for summary judgment as to its counterclaim is denied.
IT IS FURTHER ORDERED that the pending motions in limine filed by the parties are denied as befog moot.
IT IS FURTHER ORDERED that this Decision and Entry shall constitute the final entry in this matter and, as all issues have been resolved, it is a final appealable order and there is no just cause for delay. Further, as Balance is the prevailing party in this matter, costs are taxed to TQL.

The alteration of the original bill of lading by the Sun City lady contained the following: "Friday at 3:30 all slabs are broke. Fell of (sic) truck after driver unstrapped." [Ex. 8 to Jose Bernal's deposition, fifth page (Bal0027) ]

Adrian translated his and the Sun City lady's handwritten comments on the bill of lading at p. 82-84. Adrian's comments were defending his actions and the Sun City lady's were shifting the fault of the cargo falling to Adrian.

A copy of the bill of lading sent to Balance by Adrian at 3:05 p.m. on 6/17/2016, is at the fourth page, (Bal0026), of Ex. 8 of Jose's deposition

A copy of this decision is attached.